IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**District Judge R. Brooke Jackson**

Civil Action No. 16-cv-02869-RBJ

MATHEW GUEVARA,

      Applicant,

v.

RICK RAEMISCH, and
CYNTHIA COFFMAN, Attorney General of the State of Colorado,

      Respondents.

---

ORDER DISMISSING § 2254 APPLICATION

---

Applicant, Mathew Guevara, has filed an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. (Docket No. 1). Respondents have filed an Answer (Docket No. 30) and Applicant was afforded an opportunity to file a Reply. The Court has considered the same, along with the state court record. For the reasons discussed below, the Application will be DENIED.

## I. Background and State Court Proceedings

On June 10, 2010, Mr. Guevara was convicted by a jury of first-degree murder in Denver District Court Case No. 08CR6460. (ECF No. 1 at 1). He was sentenced to a prison term of life without parole. (*Id.*).

In Applicant's direct appeal proceeding, the Colorado Court of Appeals summarized the relevant facts as follows:

> In 2008, Guevara was charged with first degree murder and proceeded to a jury trial for stabbing J.B. (the victim). According to the trial testimony, either Guevara or Eric Candelaria, or both of them, stabbed the victim over sixty times in the back seat of a car. They dragged him to the outside of an apartment building and left

him just inside the gate in sub-freezing weather. The doctor who performed the autopsy testified that the victim died predominantly from blood loss due to deep stab wounds in the neck and stomach areas, and that hypothermia possibly was a contributing factor.

The prosecution introduced Guevara's video-recorded statement to police, during which he admitted stabbing the victim twice in the stomach. It also elicited Candelaria's girlfriend's (K.L.'s) testimony that Guevara confessed to her that he committed the crime and that Candelaria was not involved. Based on this evidence, the prosecution argued that Guevara was guilty of first degree murder either as a principal or a complicitor. Guevara argued that he committed a lesser degree of murder or manslaughter, or that he acted in self-defense based on his statement to police that he stabbed the victim only two times when the victim grabbed his throat and squeezed it.

(Docket No. 9-3 at 2-3).

Mr. Guevara's conviction was affirmed on direct appeal in *People v. Matthew Joseph Guevara,* No. 10CA1553 (Colo. App. July 31, 2014) (unpublished decision). (Docket No. 9-3).   The Colorado Supreme Court denied Applicant's petition for certiorari review on August 24, 2015.   (Docket No. 1 at 2; No. 9-5).   Mr. Guevara then filed a petition for certiorari review in the United States Supreme Court, which was denied on January 11, 2016.   (Docket No. 1 at 7, 11).

Mr. Guevara initiated this action on November 23, 2016.   He asserts four claims in the Application:

(1) The admission of his videotaped involuntary confession violated due process.   (Docket No. 1 at 4).

(2) The evidence presented at trial was insufficient to support his conviction for first-degree murder.   (*Id.* at 5).

(3) He was denied his constitutional right to confront a key witness at trial when the court limited his cross-examination.   (*Id.*).

(4) The jury instruction on complicity violated his due process rights. (*Id.* at 6).

In the pre-answer response, Respondents conceded that the Application was timely and that Applicant exhausted his state court remedies for claim one. (Docket No. 9). Respondents argued, however, that Applicant failed to exhaust available state remedies for claims two, three and four because he did not seek certiorari review of the claims in the Colorado Supreme Court. (*Id.*). In a May 1, 2017 Order, Senior Judge Lewis T. Babcock rejected Respondents' assertion of the failure-to-exhaust defense for claims two through four, concluded that the claims were exhausted, and ordered that the Application be drawn in its entirety to a presiding judge. (Docket No. 18).

The Court reviews the merits of Applicant's claims below under the deferential AEDPA standard of review.

## II. Legal Standards

### A. 28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The applicant bears the burden of proof under § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).   *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).   The threshold question the court must answer under § 2254(d)(1) is whether the

applicant seeks to apply a rule of law that was clearly established by the Supreme Court

at the time his conviction became final.   *See Williams v. Taylor*, 529 U.S. 362, 390

(2000).   Clearly established federal law "refers to the holdings, as opposed to the dicta,

of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Id.* at 412.   Furthermore,

> clearly established law consists of Supreme Court holdings in cases where
> the facts are at least closely-related or similar to the case *sub judice*.
> Although the legal rule at issue need not have had its genesis in the
> closely-related or similar factual context, the Supreme Court must have
> expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).   If there is no clearly established

federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).   *See id.* at

1018.

 If a clearly established rule of federal law is implicated, the court must determine

whether the state court's decision was contrary to or an unreasonable application of that

clearly established rule of federal law.   *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if:
> (a) "the state court applies a rule that contradicts the governing law set forth
> in Supreme Court cases"; or (b) "the state court confronts a set of facts that
> are materially indistinguishable from a decision of the Supreme Court and
> nevertheless arrives at a result different from [that] precedent."   *Maynard*
> [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks
> and brackets omitted) (quoting *Williams*, 529 U.S. at 405).   "The word
> 'contrary' is commonly understood to mean 'diametrically different,'
> 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S.
> at 405 (citation omitted).

> A state court decision involves an unreasonable application of

clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The federal court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry. *See Williams*, 529 U.S. at 409-10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). In conducting this analysis, the court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

Under this standard, "only the most serious misapplications of Supreme Court

precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also*

*Harrington*, 562 U.S. at 88 (stating that "even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington,* 562 U.S. at 102.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court

that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The court reviews claims asserting factual errors pursuant to 28 U.S.C.

§ 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002).

Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the

relevant state court decision was based on an unreasonable determination of the facts in

light of the evidence presented to the state court. Pursuant to § 2254(e)(1), the court

must presume that the state court's factual determinations are correct and the petitioner

bears the burden of rebutting the presumption by clear and convincing evidence. "The

standard is demanding but not insatiable . . . [because] '[d]eference does not by definition

preclude relief.'" *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller–El v.

Cockrell*, 537 U.S. 322, 340 (2003)).

**B. *Pro Se* Litigant**

Applicant is proceeding *pro se*. The court, therefore, "review[s] his pleadings and

other papers liberally and hold[s] them to a less stringent standard than those drafted by

attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *Pro se* status does not entitle a litigant to application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

**III. Analysis**

    **A. Claim One**

For his first claim, Mr. Guevara contends that the trial court's admission of his videotaped involuntary confession to the police violated due process. (Docket No. 1 at 4). Specifically, he argues that his inculpatory statements "were involuntary due to psychological coercion and promises that confession would lead to leniency." (*Id.*).

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Further, due process prohibits conviction of a defendant based, "in whole or in part, upon an involuntary confession." *Jackson v. Denno*, 378 U.S. 368, 376 (1964).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The Constitution is not

"concerned with moral and psychological pressure to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 470 U.S. 298, 304–305 (1985). *See also Culombe v. Connecticut,* 367 U.S. 568, 576 (1961) (recognizing that a confession is not involuntary where it is "naturally born of remorse, or relief, or desperation, or calculation.").

In *Bram v. United States*, 168 U.S. 532 (1897), the Supreme Court held that, for a confession to be voluntary, it may not be "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight." *Id.* at 542-43. However, the Supreme Court subsequently retreated from *Bram's* "but for" test by adopting a totality of the circumstances test. *See Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991) (recognizing that *Bram* does not state the standard for determining the voluntariness of a confession under current precedent; instead, voluntariness must be determined under the totality of the circumstances).

If the totality of the circumstances of the police interrogation demonstrate that the suspect's "will has been overborne and his capacity for self-determination critically impaired," the confession was not voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). *See also Dickerson v. United States*, 530 U.S. 428 (2000) (reaffirming that the voluntariness of a confession is based on the totality of the circumstances of the police interrogation to determine "'whether a defendant's will was overborne," citing *Schneckloth*); *Mincey v. Arizona*, 437 U.S. 385, 401 (1978).

Factors relevant to the voluntariness analysis include the age, education and intelligence level of the defendant; whether the defendant was advised of his constitutional rights; the length of detention; the repeated and prolonged nature of the

questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226. Threats or violence, promises of leniency, and the exertion of any improper influence are factors to be considered in determining whether a defendant's confession was coerced under the totality of the circumstances analysis. *See Fulminante*, 499 U.S. at 286-87; *see also Sharp v. Rollings*, 793 F.3d 1216, 1229 (10th Cir. 2015) ("'Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and depending on the totality of the circumstances, may render a confession coerced.'") (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997)).

Without more, misrepresentations, ruses, and trickery by questioning authorities do not render an otherwise voluntary confession involuntary. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (interrogator's misrepresentation to suspect that accomplice had already confessed did not render suspect's confession coerced).

### 1. State court proceedings

On direct appeal, the Colorado Court of Appeals analyzed Mr. Guevara's claim under *Mincey* and *Connelly*, as well as state court appellate cases applying the totality of the circumstances test. (*See* Docket No. 9-3 at 4-7). The state appellate court rejected Applicant's claim on the following grounds:

> The trial court found that, under the totality of the circumstances, there was no "coercive governmental conduct in this case. Certain interrogation techniques were used to encourage the defendant to talk. Counsel has suggested that the detectives were not completely truthful in their assessment of the situation with the defendant, but that's — truthfulness is not a requirement."[1] It added that "no promises or threats were made" and that "[t]he detective was very upfront [sic] with the defendant about the

---

1 State Court R. ("R"), 4/8/10 Hrg. Tr. at 14-15.

charges he was facing and the seriousness of those charges. There is simply no evidence of coercion here."[2]

Guevara contends this ruling was in error and argues that the detectives repeatedly and insistently engaged in coercive questioning for over an hour, by making implied promises of leniency and false representations of their knowledge of the evidence against him. Thus, he argues, his statements were not the product of his free will.

Upon our review of the record, the totality of the circumstances shows that Guevara's statements were made without the presence of, or consultation with, an attorney, and were made in the context of a custodial interrogation at the police station after the waiver of his *Miranda* rights. Guevara had an eleventh grade education, and, although he had prior experience in the criminal justice system, he indicated that he had not previously seen a *Miranda* waiver form. There was no indication that Guevara was under the influence of drugs or alcohol. The two detectives who interrogated him employed a conversational tone during the two hour interrogation in a small room and made no threats, but made certain statements that could be characterized as implied promises:

> [Y]ou gotta' be under a lot of stress right now trying to think, "How do I get out of this?" The easiest way is just to tell us exactly what happened and why it happened.
> . . .

> [Y]ou're not gonna have any future by telling us these lies.
> . . .

> [Y]ou have a lot to lose. It sounds like you have a prospective music career, this rap you do and stuff, and you have a girlfriend and you want to have a baby and stuff, and that's what I was trying to tell you before, you can recover from this because you're a young man. You can recover from it ok?
> . . .

> [W]hen this goes to trial, and it is going to go, unless something changes between [sic] then and you know, you decide to talk about.
> . . .

> It's not going to make things worse for you. Just get it over with and you know, talk to us about it, and get on with your life. You know, so make this the starting point of coming back up and getting this behind you, you know.

---

2 *Id.*

. . .

I mean we can't lie to you and say you probably won't go to jail, but, you know . . . .[3]

. . .

In the present case, the detectives made statements that can be interpreted as implied promises. However, we must consider, under the totality of the circumstances, whether they played a significant role in inducing Guevara's confession. . . . .Guevara was properly advised of, and waived, his *Miranda* rights. He had prior experience in the criminal justice system. And the detectives' tone remained conversational, and they never promised Guevara specific help in exchange for his confession. [State case law citation omitted].

While we do not condone the detectives' comments, or their conduct in misrepresenting the scope of their knowledge concerning Guevara's culpability, these comments alone did not render the confession involuntary. Significantly, the overall atmosphere of the interrogation was not otherwise coercive and none of the explicit promises or other techniques condemned in [*People v. Freeman*, 668 P.2d 1371, 1380 (Colo. 1983)] took place here.
. . . .

[As in *People v. Zadran*, 314 P.3d 830 (Colo. 2013)], there were no threats, the interrogation was not lengthy, Guevara was calm, and the tone was conversational. Although the detective's comment concerning Guevara's prospective career, girlfriend, and desire to have a baby might suggest an exploitation of Guevara's expressed future goals, we do not perceive the comment as coercive.
. . .

Thus, we conclude that Guevara's confession was voluntary under the totality of the circumstances, and that trial court properly admitted his confession.

(Docket No. 9-3 at 7-14).

## 2.  Application of AEDPA standard of review

---

3 R., People's Trial Ex. 62 (DVD of Applicant's videotaped statement to the police).

Although the ultimate question of whether Mr. Guevara's confession was voluntary is a legal question, subsidiary issues such as whether the police threatened the Applicant or made promises of leniency are questions of fact. *See Unites States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) ("The district court's determination that an officer's actions amounted to a promise of leniency is a factual finding."). *See also Miller v. Fenton*, 474 U.S. 104, 112 (1985).

The Court has carefully reviewed the DVD of Applicant's videotaped police interview. The state courts' factual findings that the detectives did not threaten or make any express promises to Applicant in exchange for his confession are supported by the record and Applicant has not pointed to any clear and convincing evidence to the contrary. However, as recognized by the Colorado Court of Appeals, the detectives did make statements to Mr. Guevara that can be construed reasonably as implied promises.

Putting aside momentarily the issue of the implied promises made to Mr. Guevara, the other circumstances of the interrogation support the Colorado Court of Appeals' determination that Applicant's confession was voluntary. At the beginning of the interview, Applicant was told that he was being charged with first degree murder and was advised of his *Miranda* rights. He indicated that he understood his rights and then waived them.[4] Applicant was not hand-cuffed during the interview, which lasted approximately two hours. The detectives' tone was calm and conversational throughout the interview. Mr. Guevara was lucid and responsive and nothing occurred during the interview to suggest that his level of intelligence or education rendered his statements to

---

4 The Court notes that Mr. Guevara has never challenged the validity of his waiver of the right to have counsel present at the police interview.

the detectives involuntary, or that he suffered from a mental impairment that was exploited by the detectives. And, finally, the detectives did not injure Applicant physically or deny him physical necessities. As the Colorado Court of Appeals reasonably found, these factors weigh in favor of a finding of voluntariness.

Although the state appellate court also recognized that the detectives made some false representations of their knowledge of the evidence against Mr. Guevara, false statements about the evidence, without more, do not demonstrate that a confession was involuntary. *See Frazier*, 394 U.S. at 739. *See also Lucero v. Kerby,* 133 F.3d 1299, 1311 (10th Cir.1998) (holding that defendant's inculpatory statements were admissible even though officer made "false statements about fingerprint evidence found" at the crime scene, because "such misrepresentations, without more, do not render an otherwise voluntary confession involuntary").

The critical question is whether the state court reasonably determined that the detective's implied promises to Mr. Guevara during the interview were not coercive, and, therefore did not render his confession involuntary.

### a. Mr. Guevara's police interview

The DVD of Mr. Guevara's videotaped interview with Denver Police Department Detectives Martinez and Dennison reflects the following: For the first 38 minutes of the interview, Applicant denied that he was in the car with Mr. Candelaria and Mr. Baca (the victim), as Ms. Leroy drove her roommate to work. Applicant also denied that he drove up to Greeley with Mr. Candelaria, Ms. Leroy and Ms. Lopez to dispose of any crime evidence, or that he threw a knife out the window while they drove back from Greeley to Denver. During that period of the interview, Detective Martinez informed Mr. Guevara

that his version of events had been contradicted by the statements of other witnesses, that he did not believe the Applicant and that Applicant needed to be honest with the detectives.   Approximately 38 minutes into the interview Detective Dennison said to Applicant:

> You can't lie your way out of this.   You have to tell the truth about it.   . . .
> you're a young man, you can get past this.   There's some reason why this
> happened.     And you can get by, you want to have kids, you're nineteen
> years old—

Mr. Guevara subsequently admitted that he was in the vehicle with Mr. Candelaria, Mr. Baca, and Ms. Leroy when Leroy drove her roommate to work.   He further admitted that they dropped Mr. Baca at his house and left him on the ground by the side of the fence outside of his apartment building, but that Candelaria did not tell him what happened to Mr. Baca.     Applicant further admitted that he drove up to Greeley with the group later that day, but he did not know why they went up there, except to visit a friend of Mr. Candelaria.

About 43 minutes into the interrogation, the detectives asked Mr. Guevara why he had initially lied to them about whether he had been in the car.   Mr. Guevara responded that he "was really nervous 'cause you said that I had a warrant for a homicide or something like that."   Applicant then stated:

> Like, I don't want nothing, nothing to come back to me or anything like that
> cause, I mean, my girl, I don't know if she's pregnant right now, but if she is,
> I really want a kid and everything and I really want a life, I want an actual life.
> I'm, I'm gonna be going to Everest College.   I'm gonna be doing something
> good.[5]

The detective then told Mr. Guevara that he had not owned up to anything except being a passenger in the car and that he was not telling them the whole truth.     Detective

---

5 R. People Ex. 62 at :44.

Martinez insisted that they knew Applicant was guilty, that he needed to explain why Baca was stabbed, and that Applicant was not helping himself by lying and not showing any remorse.[6]

Approximately 56 minutes into the interview, Detective Dennison told Mr. Guevara: "[Y]ou gotta' be under a lot of stress right now trying to think, 'How do I get out of this?' The easiest way is just to tell us exactly what happened and why it happened.'"[7] Applicant continued to insist that he had not hurt Mr. Baca, that he did not know Baca had been stabbed, and that Baca was breathing when he left him outside of his apartment building on the ground. The detective then made the following statements to Mr. Guevara:

- [Y]ou're not gonna have any future by telling us these lies.[8]

- [Y]ou have a lot to lose. It sounds like you have a prospective music career, this rap you do and stuff, and you have a girlfriend and you want to have a baby and stuff, and that's what I was trying to tell you before, you can recover from this because you're a young man. You can recover from it ok?[9]

- [W]hen this goes to trial, and it is going to go, unless something changes between [sic] then and you know, you decide to talk about.[10]

Detective Dennison again tells Mr. Guevara that they were going to be able to prove that he stabbed Mr. Baca "scientifically and with testimony and with other types of evidence."[11] Applicant repeated that he did not hurt Mr. Baca.[12]

---

6 *Id.* at :53-54.
7 *Id.* at :56.
8 *Id.*at 1:07.
9 *Id.* at 1:08-09.
10 *Id.*at 1:10.
11 *Id.*
12 *Id.*at 1:11.

Detective Dennison then told Applicant that they could see he was just about ready to tell them what happened. The detective stated:

- It's not going to make things worse for you. Just get it over with and you know, talk to us about it, and get on with your life. You know, so make this the starting point of coming back up and getting this behind you, you know.[13]

- You know, this is the low point, everything's going to be up from here, you know. I mean, we can't lie to you and say you probably won't go to jail, but, you know . . . .[14]

After this last statement by the detective, Mr. Guevara admitted that he stabbed Mr. Baca twice in the stomach, but didn't know that Mr. Baca had been "butchered."[15] He stated that Baca, who was a big man, was leaning on him in the backseat of the car and had placed his right hand around Applicant's neck, at which point, Applicant stabbed him because he thought Baca was going to choke him.[16] Mr. Guevara also told the police that Mr. Candaleria had stabbed the victim "quite a bit" and that he heard Mr. Baca say, "please stop," to Candelaria several times.[17]

At the end of the interview, Mr. Guevara stated:

I just need to know real quick, I want, like, an estimate on what, how much, . . . time are they going to sentence me to? Cause I know it ain't gonna be no five, six years, it's gonna be more. I need to know so I can call my sister and let her know.[18]

The detectives did not respond to Applicant's inquiry, but instead asked him if he needed a drink of water.[19] The interview then concluded.

### b. consideration of relevant federal case law

---

13 *Id.* at 1:12-13.
14 *Id.* at 1:13.
15 *Id.* at 1:14-:15.
16 *Id.* and 1:21-:22.
17 *Id.* at 1:17-:19.
18 *Id.* at 1:54.
19 *Id.* at 1:54-55.

The Colorado Court of Appeals applied the clearly established totality of the circumstances test in determining that Mr. Guevara's confession was not involuntary. Therefore, the state appellate court's decision could not have been contrary to Supreme Court law under 28 U.S.C. § 2254(d)(1). Instead, the Court's inquiry on federal habeas review is whether the Colorado Court of Appeals' determination was a reasonable application of the totality of the circumstances test under federal law.

### (1) Supreme Court case law

In *Fulminante*, the Supreme Court held that a confession was coerced where a government informant threatened the defendant with violence and promised him protection from inmate violence in order to induce the defendant's inculpatory statements. 499 U.S. at 286-87. However, no Supreme Court case has held, under the totality of the circumstances test, that a police officer's implied promises of leniency constituted coercive police conduct that rendered a confession involuntary, where the circumstances of the police interrogation otherwise indicated that the defendant's statements were made of his own free will. Accordingly, the Court looks to applicable Tenth Circuit law for guidance.

### (2) Tenth Circuit case law

The Tenth Circuit's decisions in *Sharp*, *Clanton*, and *Lopez* provide a starting point for the Court's analysis.

In *Sharp v. Rollings*, the court addressed the habeas petitioner's claim that her confession to the police was involuntary, and, therefore erroneously admitted against her at trial in violation of her Fifth and Fourteenth Amendment rights. 793 F.3d at 1219. The relevant facts were as follows: During a police interrogation, the detective asked the

petitioner, who was then homeless, to explain what had happened to the murder victim. The petitioner responded by describing the attack on the victim by two other homeless individuals and stating that she did not participate in the attack, but instead tried to talk the others out of killing the victim. *Id.* at 1230. The detective then asked the petitioner if she helped burn the victim's belongings and she initially denied doing so. *Id.* However, after the detective told petitioner that she was in a "serious situation," petitioner confessed to helping burn the victim's belongings. *Id.* The petitioner immediately asked the detective if she was going to jail. *Id.* The detective responded: "No, no, no, no, no, no, no, no [no, no]. You are a witness to this thing so long as you do not do something dumb and jam yourself. If you were scared, explain to me that you were scared--- . . . Just don't tell me no if I ask you something." *Id.* Ms. Sharp then proceeded to make other incriminating statements, was arrested at the conclusion of the interview, and was ultimately convicted of felony murder. *Id.* at 1235-39.

The Kansas Supreme Court affirmed the trial court's decision not to suppress the petitioner's inculpatory statements, concluding that the statements were made voluntarily. *Id.* at 1223, 1225. On federal habeas review, the federal district court deferred to the state supreme court's factual findings, determined that the state court reasonably applied clearly established federal law, and denied the petition. *Id.* at 1226.

On appeal, the Tenth Circuit first concluded that, under the circumstances, the state supreme court's finding that the detective had not promised the petitioner leniency was an unreasonable determination of fact under 28 U.S.C. § 2254(d)(2), and, therefore, was not entitled to deference. *Id.* at 1230. Instead, the Tenth Circuit found that the detective, after receiving an incriminating statement from the petitioner, "immediately and

18

unequivocally reassured [the petitioner] she was not going to jail. In short, he promised she would not go to jail despite her confession." *Id.* The Circuit Court further found that that the detective's subsequent comments had not "altered his clear promise of leniency" or "diluted his insistence that [the petitioner] would not go to jail despite her confession. His assurance was a promise that [the petitioner] would be treated leniently." *Id.* at 1231.

Upon determining that AEDPA deference did not apply under § 2254(d)(2), the *Sharp* court engaged in a *de novo* review of the detective's interview with the petitioner to determine whether it was involuntary. *Id.* The Tenth Circuit agreed that several uncontested facts found by the Kansas Supreme Court relevant to the voluntariness analysis weighed in favor of voluntariness. *Id.* However, the court found that the detective's assurance petitioner would not go to jail for her role in the crime "was a critical and troubling moment in the interview." *Id.* After the petitioner admitted to evidence destruction in a murder investigation, she immediately and anxiously asked if she was going to jail. *Id.* at 1234. The detective "flatly rejected [petitioner's] concern about going to jail without equivocation. He did not say the charging decision was in the prosecutor's hands [or] express uncertainty about her fate." *Id.* The Tenth Circuit found: "Detective Wheeler's promise she would not go to jail induced her confessional statements because he made clear there would be no cost of disclosure. He gave Ms. Sharp a –get-out-of-jail free card, and she obliged by giving him more incriminating details." *Id.* The court concluded that, based on the totality of the circumstances, the petitioner's will was overborne, and her subsequent incriminating statements involuntary, once the detective "promised her she would not go to jail after she admitted to participating in the crime." *Id.* at 1235.

In *Clanton*, the Tenth Circuit concluded that a police officer was not entitled to qualified immunity in a § 1983 action because the officer should have known that his apparent promise of leniency—i.e, telling the suspect that "he would get a twenty-five year sentence if he didn't confess, but would 'get off lightly' if he confessed to a pattern of events suggested by the officer—together with the officer's false statements to the suspect about the evidence against him, "would make it more likely that the confession would be considered involuntary." 129 F.3d at 1158.

In *Lopez*, federal agents used the terms "mistake," "murder," "6," and "60" during a police interrogation in order to promise the defendant that he would spend fifty-four fewer years in prison if he would confess to killing the victim by mistake. The Tenth Circuit found that the agent's express promise of leniency, together with the agents' subsequent reinforcement of that promise by telling the defendant about other suspects who had received lenient sentences after confessing to killing by mistake, as well as the agents' misrepresentation and exaggeration of the evidence they had against the defendant, were sufficient circumstances to overbear the defendant's will and make his confession involuntary. 437 F.3d at 1064-65.

The present case is factually distinguishable from *Sharp*, *Clanton* and *Lopez*. In those cases, the Tenth Circuit found that the confessions were induced by promises that were more express and specific than the detectives' implied promises to Mr. Guevara that he may have a future if he told them the truth about what happened to Mr. Baca.

In *United States v. Varela*, No. 13-8067, 576 F. App'x 771, 778-80 (10th Cir. Aug. 13, 2014), the Tenth Circuit held in an unpublished opinion that a police officer's "vague and generic" statement during interrogation that "I think we can, we can do something.

I'm just saying I can't say—I can't take those charges away [pause] right now" did not render the defendant's confession involuntary where officers were polite and friendly during the 2½ hour interview; the defendant was an adult who spoke and understood English well, appeared intelligent, had prior experience with the criminal justice system, and had waived his *Miranda* rights after being advised. *See also Thiang v. Lewis*, No. 12-16260, 548 F. App'x 407, 408 (9th Cir. Dec. 6, 2013) (unpublished) (concluding that detective's statement to the habeas petitioner during police interrogation that "I'd rather use you as a witness than . . . a suspect" was not coercive conduct that induced the defendant's subsequent confession under the totality of the circumstances; the state appellate court's decision was a reasonable application of the law under § 2254(d)(1)).

And, finally, it is well established in the Tenth Circuit that a law enforcement officer's general statements to a defendant that his cooperation may have benefits, without any other indications of coercion, does not compel a finding that a defendant's statement is involuntary. *See*, *e.g., United States v. Nguyen*, 155 F.3d 1219 (10th Cir. 1998); *United States v. Roman-Zarate*, 115 F.3d 778, 782 (10th Cir.1997).

The interview, *in toto*, reflects that the detectives played hard on Mr. Guevara's guilt in an effort to obtain a confession. For the first half of the interview, Mr. Guevara insisted that he had not hurt Mr. Baca, but the detectives were equally adamant that Applicant was lying and that they had the evidence to prove it. Although the detectives did not make express promises of leniency to the Applicant, they did make six statements to him suggesting that he could still have a future outside of prison if he confessed. After Detective Dennison told Mr. Guevara that "he was a young man, you can get past this . . . and have kids, you're nineteen years old—," Applicant admitted that he had been in

the vehicle with Mr. Candelaria and Mr. Baca, had participated in dragging Mr. Baca to the side of his apartment building and leaving him outside, and had driven up to Greeley with the others later that day.   However, Mr. Guevara repeated that he had not hurt Mr. Baca. After Detective Dennison made five more statements to Applicant suggesting that he may have a future if he told them the truth about what happened, Mr. Guevara confessed to stabbing Mr. Baca twice.   Mr. Guevara exhibited considerable remorse after his confession, breaking down in tears, and stating several times that Mr. Baca was a good person who did not deserve to die.   Although Applicant asked the detectives how much prison time he would have to serve and assumed it would be more than five to six years, the detectives did not respond to that inquiry.   Mr. Guevara also acknowledged after he confessed to stabbing Mr. Baca that he "was going to be locked up for a while" [20] and had just "thrown his . . . life away."[21]

Under the totality of the circumstances of the police interview, it is not clear whether Mr. Guevara confessed because he was overcome by his own guilt and remorse and knew that the officers did not believe his story, or whether his will was overborne and his capacity for self-determination was critically impaired by the detectives' implied promises to him that he may have a future if he told them the truth.   Although it is a close question, and this Court might rule differently under a *de novo* standard of review, the Court is constrained to find, under the deferential standard of review in § 2254(d)(1), that the Colorado Court of Appeals' conclusion that Applicant's confession was voluntary was a reasonable application of the totality of the circumstances test.   In other words, this Court concludes that the state appellate court's determination was not "so lacking in

---

20  R., People's Ex 62 at 1:16.
21  *Id.* at 1:24.

justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington,* 562 U.S. at 103. *See also White v. Woodall*, 124 S.Ct. 1697, 1706-07 (2014) (stating that "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded disagreement" on the question," citing *Harrington*); *Woods v. Donald*, 575 U.S. ___, 135 S.Ct. 1372, 1376 (2015) ("When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.") (per curiam ).

Applicant is not entitled to federal habeas relief for his first claim.

## B. Claim Two

Mr. Guevara asserts in his second claim that the evidence presented at trial was insufficient to support his conviction for first-degree murder. (Docket No. 1 at 5).

A constitutional challenge to the sufficiency of the evidence is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979). Evidence is sufficient to support a conviction as a matter of due process if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Coleman v. Johnson*, ____ U.S. ____, 132 S.Ct. 2060, 2064 (2012) (quoting *Jackson*, 443 U.S. at 319) (emphasis in the original). The court looks at both direct and circumstantial evidence in determining the sufficiency of the evidence. *See Lucero,* 133 F.3d at 1312. A federal habeas court's review under *Jackson* is "sharply limited, and a court faced with a record of historical facts that supports

conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004) (quotations and alterations omitted). *See also Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (in reviewing the sufficiency of the evidence, the federal habeas court "may not weigh conflicting evidence nor consider the credibility of witnesses," but must "'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'") (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)).

"[F]ederal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Johnson*, 132 S.Ct. at 2064.

"*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Id.* at 2062. First, the state court defers to the jury's resolution of any disputed facts. And second, the federal court defers to the state court's resolution of the *Jackson* claim, which must be upheld provided simply that it was not "objectively unreasonable." *Id.*

### 1. State court proceedings

On direct appeal, the Colorado Court of Appeals resolved Applicant's challenge to the sufficiency of the evidence as follows:

A. Standard of Review

We review sufficiency of the evidence claims de novo. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010); . . . In so doing, we must determine whether the evidence, both direct and circumstantial, viewed as a whole and in the light most favorable to the prosecution, is sufficient to support a conclusion by a rational trier of fact that the defendant is guilty of the crime charged beyond a reasonable doubt. *Clark*, 232 P.3d at 1291.

## B. Analysis

To establish first degree murder, the prosecution was required to prove beyond a reasonable doubt that Guevara, after deliberation and with intent, caused the death of the victim. § 18-3-102(1)(a), C.R.S. 2013.

On appeal, Guevara asserts that there is insufficient evidence as to causation and intent. We address each in turn.

### 1. Causation

Guevara asserts that because there were two actors —Guevara and Candelaria — and because there were many superficial stab wounds, a conclusion that Guevara caused the victim's death — either as a principal or complicitor — could only be based on speculation. [State case law citation omitted]. We are not persuaded.

The medical examiner testified that the victim's death was predominantly the result of blood loss from the deep stab wounds in the neck and stomach areas, and that "hypothermia is possibly contributing." Here, Guevara admitted to stabbing the victim in the stomach and leaving the victim outside in the freezing temperature. Thus, the evidence, viewed in a light most favorable to the prosecution, permits an inference that Guevara's actions contributed to the victim's death. *See People v. Gentry*, 738 P.2d 1188, 1190 (Colo. 1987) (a defendant is responsible for the death of another if the death is a natural and probable consequence of his or her misconduct).

Finally, even if the jury had concluded that the stab wounds inflicted by Candelaria caused the victim's death, because Guevara admitted to stabbing the victim twice and assisting Candelaria in carrying and leaving the victim in an isolated place in freezing temperatures, we conclude that the evidence was sufficient to hold Guevara criminally liable as a complicitor.

### 1. Intent

Guevara also asserts that the circumstantial evidence was insufficient to establish that he caused the victim's death "after deliberation and with intent" because this requisite culpability could not be inferred solely from the manner in which he used the deadly weapon. Again, we are not persuaded.

One acts with intent "when his conscious objective is to cause the specific result proscribed by the statute defining the offense." § 18-1-501(5), C.R.S. 2013. And deliberation means "not only intentionally but also that the

decision to commit the act has been made after the exercise of reflection and judgment concerning the act. An act committed after deliberation is never one which has been committed in a hasty or impulsive manner." § 18-3-101, C.R.S. 2013.

Evidence of the manner in which a deadly weapon is used may furnish some proof of the requisite culpability for first degree murder. *People v. Bartowsheski*, 661 P.2d 235, 242 (Colo. 1983). This evidence may be considered, along with other circumstances attending the killing, in determining whether sufficient evidence exists to prove intent after deliberation. *Id.*; *cf. Hervey v. People*, 178 Colo. 38, 43-45, 495 P.2d 204, 207 (1972) (the use of a deadly weapon, of itself, is not a sufficient basis for the legal presumption that the killing was deliberate, premeditated, and done with express malice aforethought). Circumstances attending the killing may take the form of enmity, hostility, jealousy, or other manifestations of ill will between the accused and the victim. *People v. Madson*, 638 P.2d 18, 26 (Colo. 1981).

Here, the circumstances surrounding the victim's death permit the reasonable inference that Guevara intended to kill the victim. The record shows that Guevara: (1) fought with the victim earlier that evening and kicked him in the face; (2) insisted on riding in the car with Candelaria and the victim, despite being told to stay behind; (3) twice admitted to stabbing the victim; and (4) assisted Candelaria in abandoning the bleeding victim in freezing temperatures.

We conclude that this evidence, viewed in the light most favorable to the prosecution, is sufficient to support the inference that Guevara, after deliberation, intended to kill the victim. *See id*.

(Docket No. 1 at 16-19).

### 2. Application of AEDPA standard of review

Because the Colorado Court of Appeals applied a state law standard similar to the *Jackson* standard, this Court determines only whether the state court's determination was reasonable.

The state appellate court relied on the following evidence at Mr. Guevara's trial in support of its determination that the evidence was sufficient to support Applicant's conviction for first degree murder:

- Applicant fought with the victim a few hours before the stabbing and kicked him in the face[22];

- Applicant insisted on riding in the car with Candelaria and the victim to take the victim home, despite being told to stay behind[23];

- Applicant admitted to stabbing the victim twice in the stomach.[24]

- Applicant assisted Candelaria in abandoning the bleeding victim outside in sub-freezing temperatures.[25]

- The medical examiner testified that the victim's death was predominantly the result of blood loss from the deep stab wounds in the neck and stomach areas, and that hypothermia was possibly a contributing factor.[26]

The Court finds that the Colorado Court of Appeals' conclusion that the above evidence was sufficient to meet the elements of causation and intent under § 18-3-102(1)(a), C.R.S., and was therefore sufficient to convict Mr. Guevara of first degree murder as a principal, comported with the *Jackson* standard.

The Court further finds that the Colorado Court of Appeals' conclusion that the evidence was sufficient to hold Applicant liable as a complicitor was also reasonable under *Jackson*.   In Colorado, a person is legally accountable for the actions of another if, "with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in . . . committing the offense." § 18-1-603, C.R.S.   There is a dual mental state requirement of the complicitor that must be proven before he or she can be legally accountable for the offense of another.   "First, the complicitor must have the culpable mental state required for the underlying crime

---

22  R., 6/8/10 Trial Tr. at 40 (Kristina Leroy testimony); *id.* at 210-11 (Shana Lopez testimony).
23  *Id.* at 222 (Lopez testimony).
24  R., People's Trial Ex. 62 (DVD of Applicant's police interview).
25  R., 6/8/10 Trial Tr. at 57-58, 60-64, 75, 85-86 143 (Leroy Testimony); *see also* 6/8/10 Trial Tr. at 22 (court takes judicial notice that outside temperature at the time of the victim's death ranged from 14.7 -15.2 degrees Fahrenheit).
26  R. 6/9/10 Trial Tr. at 109-110, 112, 131 (Amy Martin testimony).

committed by the principal. Second, the complicitor must intend that his own conduct promote or facilitate the commission of the crime committed by the principal." *Bogdanov v. People*, 941 P.2d 247, 251 (Colo.), amended, 955 P.2d 997 (Colo. 1997), *disapproved of on other grounds by Griego v. People*, 19 P.3d 1 (Colo. 2001). As recognized by the state appellate court, even if Mr. Candelaria stabbed the victim several times, the evidence demonstrated that Applicant stabbed the victim at least twice in the stomach and assisted Candelaria in carrying and leaving the victim in an isolated place in freezing temperatures.

Applicant is not entitled to federal habeas relief for his second claim.

### C. Claim Three

In claim three, Mr. Guevara maintains that he was denied his constitutional right to confront a key prosecution witness at trial, Kristina Leroy, when the court limited his cross-examination. (Docket No. 1 at 5).

#### 1. State court proceedings

On direct appeal, Applicant contended that the trial court erred in limiting his cross examination of the witness on hearsay grounds and as a violation of his Sixth Amendment confrontation rights. Because Applicant failed to raise a confrontation clause objection at trial, the Colorado Court of Appeals reviewed the claim for plain error. (Docket No. 9-3 at 19-20). The state appellate court made the following determination:

> The trial court precluded Guevara, on hearsay grounds, from asking K.L. [Kristina Leroy] three questions on cross-examination: (1) whether, during an argument between her and Candelaria, her friend yelled, "Don't you hit her"; (2) whether Candelaria called her from jail to tell her that "he loved her and still wanted to marry her"; and (3) whether Candelaria promised her "that nothing would happen to her and [her seven-year-old daughter]."

Guevara asserted that the first question was nonhearsay because it was offered to show that Candelaria was angry and violent, which would go to the effect on Guevara's mental state, or, alternatively, that the first question was an excited utterance. With respect to the second and third questions, Guevara asserted that they were not offered for the truth of the matter asserted, but were instead offered to show K.L.'s bias against Guevara. On appeal, he argues that his confrontation rights were violated because he was unable to ask these questions.

Even assuming, without deciding, that these questions were erroneously precluded, we conclude that any error was harmless. Although evidence of the romantic relationship and history between Candelaria and K.L. would be admissible to show that their relationship "might lead [her] to slant her testimony in favor of Candelaria and against Guevara," *see id.*, we conclude that in light of the cross-examination permitted by the court, Guevara was amply able to explore this bias.

Here, with respect to Guevara's first question, the evidence sought was cumulative to other testimony concerning Candelaria's anger and violence. CRE 403 (relevant evidence may be excluded if cumulative); [State case law citations omitted]. Indeed, the fight between Candelaria and K.L., which triggered the statement "Don't you hit her," was loud enough to result in Guevara coming upstairs, where the fight was taking place. This fight resulted in Candelaria punching a hole in the wall and getting "crazy mad." Consequently, Guevara was on notice of Candelaria's anger, and, thus, the statement "Don't you hit her[,]" was cumulative.

With respect to Guevara's second and third questions, there was ample evidence to suggest that K.L. was biased. Indeed, K.L., both on direct examination and on cross-examination, admitted that she and Candelaria had been in a serious relationship, that the two had discussed marriage, and that she was infatuated with him and had often put his needs before her own. Thus, because the jury was already presented with evidence of K.L.'s potential bias, we conclude that any error by the trial court was harmless. [State case law citations omitted].

And based on this determination, we further conclude that any arguable confrontation error does not rise to the level of plain error. *See Hagos v. People*, 2012 CO 63, ¶ 18 (plain errors are both "obvious and substantial," and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction). Indeed, as noted, Guevara's potential cross-examination questions would have elicited cumulative evidence. Additionally, the prosecution's case was strong, given that Guevara twice admitted to stabbing the victim and assisting Candelaria in leaving the victim in an isolated place, bleeding, and in freezing temperatures. Finally, Guevara could not be excluded from the DNA results

on the knife used. Thus, in light of this record, any potential error did not rise to the level of plain error. [State case law citations omitted].

(Docket No. 9-3 at 21-24).

### 2. Procedural defense

Respondents argue in their Answer that Mr. Guevara defaulted claim three in the state courts pursuant to a state procedural rule, thereby precluding federal review on the merits. (Docket No. 30 at 25-31). However, in the pre-answer response, Respondents did not raise a procedural default defense as to claim three. During preliminary review, Magistrate Judge Gordon P. Gallagher and Senior Judge Lewis T. Babcock *sua sponte* recognized and addressed the potential applicability of the procedural default doctrine to Applicant's third claim. (Docket No. 13, Order to Show Cause; Docket No. 18, Order Drawing Case). However, Judge Babcock ultimately concluded in the Order Drawing Case that claim three was not procedurally barred based on the state appellate court's application of both a plain error and harmless error analysis to the claim. (Docket No. 18 at 9). *See Douglas v. Workman*, 560 F.3d 1156, 1178 (10th Cir. 2009) (if it is not clear whether the substance of the state court's plain-error review was merits or non-merits based, the Court must assume the state's review was merits based).

Respondents essentially ask this Court to exercise its discretion to reconsider Judge Babcock's interlocutory order and find that claim three is procedurally barred. *See, e.g.*, *Price v. Philpot*, 420 F.3d 1158, 1167 n. 9 (10th Cir. 2005) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."). However, even if Respondents are correct that claim three is procedurally barred, a federal habeas court may dismiss a claim on the merits without resolving the procedural defense. *See Snow v. Sirmons*, 474 F.3d 693, 717 (10th Cir. 2007) ("We can avoid deciding procedural

bar questions where claims can readily be dismissed on the merits"); *see also Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2003) ("When questions of procedural bar are problematic, however, and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits.").   Because claim three is subject to dismissal on the merits for the reasons discussed below, the Court will not reconsider whether the claim is subject to a procedural bar.

### 3.  Applicable federal law

Where a state court assumes a constitutional violation in order to address whether the defendant was actually harmed by the violation, the state court's decision is a merits-based determination entitled to AEDPA deference.   *See Davis v. Ayala*, 135 S.Ct. 2187, 2198 (2015); *Littlejohn v. Trammell*, 704 F.3d 817, 850 n. 17 (10th Cir. 2013).   On direct review, a federal constitutional error in conjunction with a state criminal conviction requires reversal if "there is a reasonable possibility that the [error] might have contributed to the conviction." *Chapman v. California*¸386 U.S. 18, 24 (1987) (internal citation and quotation marks omitted).   However, on federal habeas review, if the state appellate court found an alleged federal constitutional error harmless under the federal standard in *Chapman*, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."   *Davis*, 135 S.Ct. at 2199 (quoting *Fry v. Plier*, 551 U.S. 112, 119 (1998) (per curiam)).

The Court considers the following factors in determining whether a Confrontation Clause error was harmless: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or

absence of evidence corroborating or contradicting the testimony of the witness on material points; and (4) the extent of cross-examination permitted, and (5) the overall strength of the prosecution's case. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). *See also Littlejohn*, 704 F.3d at 845 (citing *Van Arsdall* factors relevant to harmless error analysis).

Further, a habeas petitioner is "not entitled to habeas relief based on trial error unless [the petitioner] can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). That is, the constitutional error at trial must have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Stated otherwise:

> When a federal court considers a Confrontation Clause violation in a habeas proceeding, the relevant harmless error analysis is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error had substantial and injurious effect or influence in determining the jury's verdict.

*Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000) (citations omitted) (quoting *Van Arsdall*, 475 U.S. at 684, and *Brecht*, 507 U.S. at 623, 637-38). *See also Littlejohn*, 704 F.3d at 843 (citing *Jones*).

Therefore, to succeed on his third claim, Mr. Guevara must show that: (1) no fair-minded jurist could agree with the Colorado Court of Appeals' determination that the trial court's preclusion of the questions on cross examination did not constitute harmless error; and, (2) he was actually prejudiced by the trial court's exclusion of the specific questions on cross examination. *Davis*, 135 S.Ct. at 2199.

### 4. Application of AEDPA standard of review

The Court first considers whether the Colorado Court of Appeals' harmless error analysis was consistent with the *Van Arsdall* factors.

Under the first *Van Arsdall* factor, Ms. Leroy was an important prosecution witness. She testified that she was present in the vehicle with Mr. Guevara and Mr. Candelaria when the stabbing(s) occurred.[27] Although Leroy was driving the vehicle and did not witness the stabbing(s) in the backseat, she watched both men drag the victim's body to the side of the victim's apartment building and leave him bleeding on the ground in sub-freezing temperatures.[28] Ms. Leroy also testified on direct exam that Applicant confessed to her later that day that he was the one who had stabbed the victim and that Candelaria was not responsible.[29]

Under the third *Van Arsdall* factor, Leroy's testimony was corroborated on material points by the testimony of Shana Lopez. Ms. Leroy and Ms. Lopez both testified about the fight between Candelaria and Leroy, which triggered the statement "Don't you hit her," and resulted in Candelaria punching a hole in the wall.[30] Ms. Leroy and Ms. Lopez also testified that when the victim and Applicant came upstairs to see what was going on, Candelaria and the victim got into a physical fight, which resulted in Candelaria punching the victim, causing him to fall to the floor.[31] In addition, Leroy's testimony was consistent with the testimony of Lopez as to the actions of Applicant and Candelaria in attempting to dispose of the evidence after the crime.[32]

---

27  R. 6/8/10 Trial Tr. at 49-57 (Leroy testimony).
28  *Id.*, and 60-65.
29  *Id.* at 75, 85-86.
30  R., 6/8/10 Trial Tr. at 35-38 (Leroy testimony); *id.* at 206-08 (Lopez testimony).
31  *Id.* at 38-39 (Leroy testimony); *id.* at 210-11 (Lopez testimony).
32  *Id.* at 70-79, 90-91 (Leroy testimony); *id.* at 224-28, 237-39, 241 (Lopez testimony).

Under the second *Van Arsdall* factor, testimony by Ms. Leroy that Ms. Lopez yelled, "Don't you hit her"[33] during an argument between Leroy and Candelaria the night before the stabbing would have been cumulative to other testimony concerning Candelaria's anger and violence, as discussed in the preceding paragraph. In addition, testimony by Leroy that Candelaria called her after he was arrested to tell her that "he loved her and still wanted to marry her," and that he promised Leroy "that nothing would happen to her and [her seven-year-old daughter]"[34] would have been cumulative to other evidence of Leroy's potential bias. Ms. Leroy testified on direct exam that she was dating Candelaria and that the two of them had discussed marriage.[35]

Under the fourth *Van Arsdall* factor, Mr. Guevara was allowed to cross exam Ms. Leroy about her bias in favor of Mr. Candelaria and her fear of him.[36] Ms. Leroy testified on cross exam that she was "infatuated" and "in love" with Candelaria and would "often do what he wanted [her] to do."[37] She also testified that when the victim came upstairs during the fight between her and Candelaria the night before the victim was stabbed, Candelaria told the victim to "rape" Leroy if she attempted to make a telephone call.[38]

Finally, the prosecution's case against Mr. Guevara was fairly strong as it included his own admissions, which were consistent with the forensic evidence.[39]

A review of the *Van Arsdall* factors shows that only the first factor weighs in favor of Applicant. The Court thus finds that the state appellate court's harmless error determination was a reasonable application of *Van Arsdall* and *Chapman*. The Court

---

33 *Id. at* 105-07 (Leroy testimony).
34 *Id.* at 124-28.
35 *Id.* at 25-26.
36 *Id.* at 95-114.
37 *Id.*at 95-97.
38 *Id.* at 107, 110.
39 R., People's Ex. 62; 6/9/10 Trial Tr. at 50-51, 60 (Berdine testimony).

further finds under *Brecht* that the state trial court's restrictions on cross examination of Ms. Leroy did not have a substantial and injurious effect on the jury's verdict, given the strength of the prosecution's case.

Applicant is not entitled to federal habeas relief for his third claim.

### D. Claim Four

For his fourth and final claim, Mr. Guevara contends that the jury instruction on complicity violated his due process rights. (Docket No. 1 at 6).

The Due Process Clause requires the prosecution to prove every element of a charged offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). To demonstrate a constitutional error from a jury instruction in a state criminal trial, a habeas petitioner must show (1) an "ambiguity, inconsistency, or deficiency" in the instruction, and, (2) that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt. *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal quotation marks and citations omitted). *See also Victor v. Nebraska*, 511 U.S. 1, 6 (1994) (the constitutional inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard."). In making this determination, the jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). A "slight possibility" that the jury misapplied the jury instruction is not enough. *See Weeks v. Angelone*, 528 U.S. 225, 236 (2000). Instead, the pertinent question "is 'whether the ailing instruction by itself so infected the

entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 72

(quoting *Cupp*, 414 U.S. at 147).

**1. State court proceedings**

The trial court gave the jurors the following instruction on complicity liability:

> A person is guilty of an offense committed by another person if he is a complicitor. To be guilty as a complicitor, the following must be established beyond a reasonable doubt:
>
> (1) A crime must have been committed.
>
> (2) Another person must have committed all or part of the crime.
>
> (3) The defendant must have had knowledge that the other person intended to commit all or part of the crime.
>
> (4) The defendant must have had the intent to promote or facilitate the commission of the crime.
>
> (5) The defendant must have aided, abetted, advised, or encouraged the other person in the commission or planning of the crime.[40]

In Mr. Guevara's direct appeal proceeding, the Colorado Court of Appeals first

determined that the complicity instruction conformed to Colorado law:

> We conclude that the trial court's jury instructions accurately informed the jury of the governing law. As noted, complicity liability exists when (1) the complicitor has the culpable mental state required for the underlying crime committed by the principal; and (2) the complicitor assists or encourages the commission of the crime committed by the principal "with the intent to promote or facilitate the commission of the offense." § 18-1-603, C.R.S. 2013; *Bogdanov*, 941 P.2d at 250-51.
>
> Here, because paragraph four of the jury instructions provided that Guevara "must have had the intent to promote or facilitate the commission of the crime[,]" we conclude that the jury instructions adequately directed the jury to determine whether Guevara had the requisite mental state for first degree murder. *See Bogdanov*, 941 P.2d at 254 ("We conclude that the

---

40 R. Court File, at 189, Instruction No. 18.

language adequately directs the jury to determine whether the defendant had the requisite mens rea of the crime, because the defendant could not have intended his participation to further the crime unless he also intended the crime to occur.").

Thus, the jury was adequately instructed on the governing law, and the trial court's rejection of Guevara's tendered instruction was not error. [State case law citations omitted].

(Docket No. 9-3 at 26-28).

The state appellate court then addressed Applicant's challenge to the "all of part

of" language in the instruction:

Guevara next asserts that the trial court's jury instructions' "all or part of" phrase has no basis in the Colorado statute defining complicity liability. Again, we disagree.

### 1. Standard of Review

As Guevara concedes on appeal, this issue was not preserved. Thus, we review for plain error. *People v. Miller*, 113 P.3d 743, 749 (Colo. 2005). As noted, plain error is an obvious and substantial error that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Id.* at 750.

### 2. Analysis

In *Bogdanov*, our supreme court concluded that the "all or part of" language in a complicity theory jury instruction, applies "in those cases where one or more persons, possibly including the defendant, together committed the essential elements of the underlying crime." 941 P.2d at 254 n.10; *see also People v. Close*, 22 P.3d 933, 938 (Colo. App. 2000).

Here, because the record contained evidence that Guevara and Candelaria together committed the essential elements of first degree murder, we conclude that the "all or part of" language in the trial court's complicity theory jury instructions did not constitute error, much less plain error.

(*Id.* at 28-29).

### 2. Application of AEDPA standard of review

The Colorado Court of Appeals, on plain error review, denied Mr. Guevara relief for his federal due process claim by deciding there was no federal law error at all. Therefore, the deferential AEDPA standard of review applies. *See Eizember v. Trammell*, 803 F.3d 1129, 1138 n.1 (10th Cir. 2015) (citing *Douglas*, 560 F.3d at 1177–78).

The state appellate court's determinations that the trial court's jury instructions "accurately informed the jury of the governing law," "adequately directed the jury to determine whether Guevara had the requisite mental state for first degree murder," and, that the "all or part of" language in a complicity theory jury instruction applies in cases where "one or more persons, possibly including the defendant, together committed the essential elements of the underlying crime," are determinations of state law that are binding on this federal habeas court. *See Bradshaw v. Richey,* 546 U.S. 74, 76 (2005) (recognizing that "[a] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") Consequently, Applicant cannot show that the instruction contained "some 'ambiguity, inconsistency, or deficiency,'" as required by Supreme Court law. *See Waddington*, 555 U.S. at 190-91.

Moreover, the Colorado Court of Appeals' determination that the evidence at trial warranted the "all or part of" language in the complicity instruction was reasonable in light of the evidence presented in the state court proceeding. As discussed in Section III.B.2, *supra*, the state appellate court concluded, consistent with the *Jackson* standard, that the evidence was sufficient to support the jury's verdict of guilt under a complicity theory. Further, the jury was instructed on the elements of first degree murder under Colorado

law, as well as the definitions of after deliberation, intent and cause.[41]   There is no reasonable likelihood that the jury applied the complicity instruction in a way that relieved the State of its burden of proving every element of the crime of first degree murder beyond a reasonable doubt.

Applicant is not entitled to federal habeas relief for his fourth claim.

**IV. Orders**

For the reasons discussed above, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (Docket No. 1), filed by Applicant, Mathew Guevara, on November 23, 2016, is DENIED.   The Application is DISMISSED WITH PREJUDICE.   It is

FURTHER ORDERED that no certificate of appealability shall issue because Applicant has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Fed. R. Governing Section 2254 Cases 11(a); *Slack v. McDaniel*, 529 U.S. 473, 483-85 (2000).   It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith   *See Coppedge v. United States*, 369 U.S. 438 (1962).   If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

Dated October 6, 2017, at Denver, Colorado.

BY THE COURT:

---

41  R., Court File, at 182, 188, 190 (Instruction Nos. 13, 17, and 19).

R. BROOKE JACKSON
United States District Judge